UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| KENAITZE INDIAN TRIBE;<br>ASA'CARSARMIUT TRIBE;<br>AKIAK NATIVE COMMUNITY;<br>NATIVE VILLAGE OF PORT HEIDEN;<br>TANANA CHIEFS CONFERENCE;<br>CHUGACHMIUT, INC.;<br>COPPER RIVER NATIVE<br>  ASSOCIATION;<br>YUKON-KUSKOKWIM HEALTH<br>  CORPORATION;<br>ARCTIC SLOPE NATIVE<br>  ASSOCIATION;<br>EASTERN ALEUTIAN TRIBES,<br><br>              Plaintiffs,<br><br>vs.<br><br>MCKINSEY & COMPANY, INC.,<br><br>              Defendant. | Case No.  1:21-op-45028<br><br><br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## **TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ................................................................................ 1

II.    JURISDICTION AND VENUE ........................................................ 2

III.   PARTIES ........................................................................................... 3

    A.    Plaintiff Indian Tribes ............................................................ 3

    B.    Plaintiff Intertribal Consortia ............................................... 7

    C.    Defendant ............................................................................. 12

IV.   FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS ........ 12

    A.    The Corporate Integrity Agreement ................................... 12

    B.    McKinsey's Role Following the Corporate Integrity Agreement ..................... 13

        1.    The Sacklers seek to divert money to themselves. .................................. 13

        2.    McKinsey supplied Purdue with Granular Sales and Marketing Strategies and Remained Intimately Involved in Implementation .......... 14

    C.    Project Turbocharge ............................................................ 15

    D.    McKinsey knew about dangers of opioids and acted to maximize OxyContin prescriptions anyway ...................... 17

    E.    Purdue's 2020 Guilty Plea and McKinsey's Recent Statement ............................. 18

    F.    The Impact of the Opioid Crisis in Alaska ........................ 19

    G.    The Impact of Opioid Abuse, Addiction and Diversion on American Indians and Alaska Natives ........................... 21

    H.    The Impact of McKinsey's Work with Opioid Manufacturers on Plaintiffs ....... 23

    I.    Tolling of Statutes of Limitations ..................................... 25

        1.    Equitable Estoppel and Fraudulent Concealment ................................... 25

        2.    McKinsey and Purdue Persisted in The Fraudulent Scheme Despite a Guilty Plea and Large Fine ......................... 27

V.    FACTUAL ALLEGATIONS PERTAINING TO CLAIMS UNDER THE RACKETTER-INFLUENCED AND CURRPOT ORGANIZATIONS (RICO) ACT: THE OPIOID MARKETING ENTERPRISE ...................................... 28

    A.    The Common Purpose and Scheme of the Opioid Marketing Enterprise ........... 28

    B.    The Conduct of the Opioid Marketing Enterprise Violated Civil RICO ............ 31

    C.    Pattern of Racketeering Activity ........................................ 32

VI.   CAUSES OF ACTION ................................................................. 36

# TABLE OF CONTENTS
(continued)

**Page**

|   |   |   |   |
|---|---|---|---|
| A. | Racketeer Influenced and Corrupt Organizations (RICO), 18 U.S.C. § 1961, et. seq. | | 36 |
| B. | Negligence under Alaska Law | | 46 |
| C. | Public Nuisance under Alaska Law | | 48 |
| D. | Fraud under Alaska Law | | 50 |
| E. | Unfair Competition (Alaska Unfair Trade Practices and Consumer Protection Act AS § 45.50.471, et seq.) | | 52 |
| F. | Civil Conspiracy under Alaska Law | | 53 |
| G. | Unjust Enrichment under Alaska Law | | 54 |
| VII. | PRAYER FOR RELIEF | | 56 |
| VIII. | JURY DEMAND | | 57 |

## I.     __INTRODUCTION__

1.      This case arises from the worst man-made epidemic in modern medical history—the misuse, abuse, and over-prescription of opioids. This crisis arose from the opioid manufacturers' deliberately deceptive marketing strategy to expand opioid use.

2.      McKinsey and Company, Inc. ("McKinsey" or "Defendant") played an integral role in creating and deepening the opioid crisis.

3.      In the years following Purdue Pharma L.P.'s ("Purdue") 2007 guilty plea for misleadingly marketing OxyContin, McKinsey worked closely with Purdue to dramatically increase OxyContin sales to the benefit of McKinsey, Purdue, and the Sackler family, the wealthy family that has owned and controlled Purdue for decades. McKinsey specifically sought to maximize OxyContin sales by working around the requirements of the Corporate Integrity Agreement that Purdue entered as part of its guilty plea. McKinsey also performed related work for other manufacturers of opioids, including Johnson & Johnson. Through the conduct described in this complaint, McKinsey participated in and helped orchestrate a broad scheme to deceptively market opioids.

4.      McKinsey knew of the dangers of opioids and of Purdue's prior misconduct, but nonetheless advised Purdue to improperly market and sell OxyContin, supplying granular sales and marketing strategies and remaining intimately involved throughout implementation of those strategies. McKinsey's actions resulted in a surge in sales of OxyContin and other opioids that fueled and prolonged the opioid crisis.

5.      As reported in the media, in a series of agreements, McKinsey recently settled opioid-related claims with 49 states, the District of Columbia, and five U.S. territories.

6.      Plaintiffs are sovereign Alaska Native tribes (also referred to as "Indian tribes") responsible for the health and well-being of their citizens, and intertribal consortia responsible

Complaint
2132207.4

- 1 -

for providing healthcare services to citizens of their constituent tribes. Native Americans have disproportionately borne the toll of the opioid crisis. Plaintiffs bring suit to hold McKinsey responsible for its role in that crisis, which has posed an existential threat to tribes and tribal communities.

7.      Plaintiffs bring this action in their proprietary capacity and pursuant to their *parens patriae* authority to protect the health, safety, and welfare of the citizens of their constituent tribes to stop the opioid epidemic in Alaska, and to recover damages and seek other redress from harm caused by the McKinsey's improper marketing practices and other unlawful conduct related to prescription opioids.

## II.    JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action because the Plaintiffs bring a federal cause of action that raises a federal question pursuant to 28 U.S.C. § 1331, and because this action is brought by multiple Indian tribes pursuant to 28 U.S.C. § 1362. The Court also has supplemental jurisdiction over the Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 because the state law claims are part of the same case or controversy.

9.      This Court has personal jurisdiction over McKinsey because at all relevant times, McKinsey  purposely availed itself of the privilege of doing business in the State of Ohio and in this District, including by engaging in the business of researching, designing, and implementing marketing and promoting strategies for various opioid manufacturers, including Purdue, in support of their sales and marketing of opioids in Ohio.

10.     Venue is proper in the United States District Court for the Northern District of Ohio under 28 U.S.C. § 1391(g) and 18 U.S.C. § 1965, and pursuant to paragraph 6(a) of Case Management Order 1, issued by this Court on April 11, 2018 in case number 1:17-CV-2804. Plaintiffs hereby assert that, but for that Order permitting direct filing in this District, Plaintiffs

would have filed their cases in the United States District Court for the District of Alaska because a substantial part of the events or omissions giving rise to this action occurred in Alaska and because the Defendant is subject to the jurisdiction of the United States District Court for the District of Alaska.

III.     **PARTIES**

    A.     **Plaintiff Indian Tribes**

**Kenaitze Indian Tribe**

11.     Plaintiff Kenaitze Indian Tribe is a federally recognized tribe located on the central Kenai Peninsula in Kenai, Alaska. The Tribe includes approximately 1,634 Tribal Citizens.

12.     The Kenai Peninsula has the highest opioid addiction rate in the state of Alaska.

13.     The Kenaitze Indian Tribe provides services to members and to the surrounding community.  At its flagship Dena'ina Wellness Center, the Tribe provides medical, dental, behavioral health, chemical dependency, wellness, physical therapy, optometry, pharmacy support, and traditional healing services.  The Tribe also provides a range of other services and programs, including tribal courts, family services, early childhood education, elder support, housing, domestic violence and sexual assault services, energy assistance, economic development, scholarships and job training, emergency assistance, natural resource management, culture and language services, and burial assistance.

14.     Like many other communities across the United States, the opioid crisis has been strongly felt by the Tribe's community, impacting every family. This crisis has caused financial stress on families, and children are encountering drugs at a much earlier age. Children are being raised by single parents, fragmented families, grandparents and great-grandparents, or are being taken into Tribal and State custody.

Complaint
2132207.4

- 3 -

15.     The opioid crisis is straining the Tribe's ability to provide adequate services to its citizens.  With its limited resources, the Tribe has been forced to divert funds away from other tribal priorities to staff new positions needed to address the opioid crisis, including substance abuse counselors, nurses and physicians specializing in addiction.

**Asa'carsarmiut Tribe**

16.     Plaintiff Asa'carsarmiut Tribe (a/k/a Native Village of Mountain Village) is a federally recognized tribe. Most of the Village's citizens live in Mountain Village, Alaska, which is located along the Yukon River in the Kusilvak Census Area.  The Tribe currently has 1,354 Tribal Citizens, 764 living in Mountain Village.

17.     The opioid crisis has devastated the Asa'carsarmiut Tribe. Opioids have contributed to Mountain Village's suicide crisis. At least five percent of the population of Mountain Village has attempted suicide in the last year.

18.     The Village's few first responders work around the clock for very little pay and with almost no training. The Village does not have the infrastructure or staff to treat opioid addiction locally.

19.     The Village must fly members of our community to Bethel (over 100 miles away) or Anchorage (nearly 500 miles away) for behavioral health treatment.

20.     The opioid crisis is straining the Village's ability to provide adequate services to its citizens.  With its limited resources, the Village has been forced to divert funds away from other tribal priorities.

**Akiak Native Community**

21.     Plaintiff Akiak Native Community is a federally recognized tribe and Yup'ik Eskimo Village.  Akiak, Alaska is located on the west bank of the Kuskokwim River, 42 miles

northeast of Bethel and 500 miles west of Anchorage.  Akiak Native Community is not part of the Alaska road system and is only accessible by plane, boat, snow machine, four-wheeler, and dog team.  Akiak Native Community has approximately 360 enrolled Tribal citizens, who almost all reside in the community.

22.     Akiak Native Community employs approximately 50 individuals throughout the year in health care, social and wellness health, public safety, Tribal Courts, environmental services, water and sewer services, the Violence Against Women program, natural resources, educational support, and community activities.

23.     Akiak has seen an increase of prescription opioids and heroin in recent years. Because of addiction, the majority of Akiak's young people are being raised by their grandparents, who are free from opioids and other harmful substances.

24.     Akiak is short of public safety personnel and treatment services to prevent deaths and must rely on the Alaska State Troopers for investigations, yet their capacity is limited to addressing felonies, and poor weather conditions often prevent an immediate response.

25.     The opioid crisis is straining Akiak's ability to provide adequate services to its citizens.  With its limited resources, Akiak has been forced to divert funds away from other tribal priorities.

**<u>Native Village of Port Heiden</u>**

26.     Plaintiff Native Village of Port Heiden is a federally recognized tribe located 424 miles southwest of Anchorage, at the mouth of the Meshik River on the north side of the Alaska Peninsula.

27.     The Village is comprised of 51.4 square miles, with 0.7 miles of it being water. This area is home to one-third of its tribal members. Port Heiden is not part of the Alaska road system and is only accessible by plane and boat.

28.     Port Heiden has been a self-governing Tribe for many years, providing direct government services to members and the surrounding community, including primary and behavioral health services, social services, housing, economic development, natural resource management, culture and language resources, and jobs.

29.     The opioid crisis has directly impacted the Tribe, affecting every family and the overall lifeblood of the Tribe. The Tribe has lost sons and daughters, mothers and fathers, and brothers and sisters to addiction and death.

30.     From a health, economic, and overall resource availability, the Tribe was not prepared for such a devastating impact. The already stretched resources needed to provide for the community have become a health and economic crisis for the Tribe and tribal members.

31.     The nearest local law enforcement or treatment resources are 424 air miles away.

32.     Therefore, drug-related crimes are on the rise without consequences. This crisis has strained every governmental and cultural service provided. Access to treatment is further limited by inclement weather and transportation issues.  The opioid crisis is straining Port Heiden's ability to provide adequate services to its citizens.  With its limited resources, Port Heiden has been forced to divert funds away from other tribal priorities.

B.  **Plaintiff Intertribal Consortia**

**Tanana Chiefs Conference**

33.     Plaintiff Tanana Chiefs Conference ("TCC") is an intertribal organization formed by 37 federally recognized tribes[1] occupying the Brooks Range and the Yukon and Tanana River watersheds in Interior Alaska, and exercises sovereign government authority as such. TCC provides a wide range of health and social services that balance traditional Athabascan and Alaska Native values with modern demands.  TCC provides healthcare and other social services to its members and other Alaska Natives/Native Americans in the region pursuant the Indian Self Determination and Education Assistance Act ("ISDEAA"), 25 U.S.C. §§ 5301–5423, and under authority delegated from its constituent tribes, as well as certain other health care, social services, and public safety services to Interior residents, including rural non-Native residents, on behalf of the State of Alaska.

34.     The TCC region covers an area of 235,000 square miles in Interior Alaska, which is equal to about 37 percent of the entire state, and just slightly smaller than the state of Texas. TCC serves 20,000 tribal members across this region.

35.     The opioid crisis is straining TCC's ability to provide adequate services to the persons it serves.  With its limited resources, TCC has been forced to divert funds away from other priorities.

---

[1] Alatna Village, Allakaket Village, Anvik Village, Arctic Village, Beaver Village, Birch Creek Tribe, Chalkyitsik Village, Circle Native Community, Evansville Village (aka Bettles Field), Galena Village (aka Louden Village), Healy Lake Village, Holy Cross Village, Hughes Village, Huslia Village, Koyukuk Native Village, Manley Hot Springs Village, McGrath Native Village, Native Village of Eagle, Native Village of Fort Yukon, Native Village of Minto, Native Village of Ruby, Native Village of Stevens, Native Village of Tanacross, Native Village of Tanana, Native Village of Tetlin, Native Village of Venetie Tribal Government, Nenana Native Association, Nikolai Village, Northway Village, Nulato Village, Organized Village of Grayling (aka Holikachuk), Rampart Village, Shageluk Native Village, Takotna Village, Telida Village, Village of Dot Lake, and Village of Kaltag.

**Chugachmiut, Inc.**

36.     Plaintiff Chugachmiut, Inc. ("Chugachmiut") is an intertribal consortium formed by seven federally recognized tribes[2] to promote self-determination to the Alaska Native communities of the Chugach region. Chugachmiut provides health and social services, education and training, and technical assistance to the Chugach Native people in a way which is acceptable to Native cultural values and tradition, in order to enhance the well-being of the people by continuing to strengthen the tribes and increase self-determination opportunities for community operated Tribal programs.

37.     Chugachmiut's region in southcentral Alaska spans approximately 15,625 square miles and comprises seven coastal tribal communities.  Chugachmiut serves a combined population of approximately 2,200 Alaska Natives and American Indians.

38.     The opioid crisis is straining Chugachmiut's ability to provide adequate services to the persons it serves.  With its limited resources, Chugachmiut has been forced to divert funds away from other priorities.

**Copper River Native Association**

39.     Plaintiff Copper River Native Association ("CRNA") is an intertribal organization designated by five federally recognized tribes[3] to provide health services, child and youth development, and life-enhancing resources to the Ahtna people of Alaska's Copper River Basin. CRNA's health services include primary medical care, behavioral health, and dental care

---

[2] Native Village of Port Graham, Native Village of Chenega, Valdez Native Tribe, Native Village of Nanwalek (aka English Bay), Qutekcak Native Tribe, Native Village of Eyak, Native Village of Tatitlek.

[3] Native Village of Cantwell, Native Village of Gakona, Gulkana Village, Native Village of Kluti-Kaah, and Native Village of Tazlina.

services.  CRNA also provides elders home services and congregate meals, employment and training services, public safety, and other social programs for tribal members within the region.

40.     CRNA's region encompasses approximately 23,000 square miles, with a service population of more than 3,000 people.

41.     The opioid crisis is straining CRNA's ability to provide adequate services to the persons it serves.  With its limited resources, CRNA has been forced to divert funds away from other priorities.

**Yukon-Kuskokwim Health Corporation**

42.     Plaintiff Yukon-Kuskokwim Health Corporation ("YKHC") is an intertribal consortium established, controlled, and sanctioned by 58 federally recognized tribes[4] located in and around the confluence of the Yukon and Kuskokwim Rivers in southwest Alaska, known as the Yukon-Kuskokwim Delta. YKHC administers a comprehensive healthcare delivery system which includes community clinics, subregional clinics, and a central regional hospital in Bethel

---

[4] Akiachak Native Community, Akiak Native Community, Village of Alakanuk, Algaaciq Native Village (aka St. Mary's), Yupiit of Andreafski, Village of Aniak, Anvik Village, Asa'carsarmiut Tribe (aka Native Village of Mountain Village), Village of Atmautluak, Village of Bill Moore's Slough, Village of Chefornak, Chevak Native Village, Native Village of Chuathbaluk, Chuloonawick Native Village, Village of Crooked Creek, Native Village of Eek, Emmonak Village, Native Village of Georgetown, Organized Village of Grayling (aka Holikachuk), Native Village of Hamilton, Holy Cross Village, Native Village of Hooper Bay, Iqurmuit Traditional Council (aka Native Village of Russian Mission), Village of Kalskag, Kasigluk Traditional Elders Council (aka Native Village of Kasigluk), Native Village of Kipnuk, Native Village of Kongiganak, Village of Kotlik, Organized Village of Kwethluk, Native Village of Kwigillingok, Native Village of Kwinhagak (aka Quinhagak), Lime Village, Village of Lower Kalskag, Native Village of Marshall (aka Fortuna Ledge), Native Village of Mekoryuk, Native Village of Napaimute, Native Village of Napakiak, Native Village of Napaskiak, Newtok Village, Native Village of Nightmute, Native Village of Nunapitchuk, Village of Ohogamiut, Orutsararmiut Native Council (aka Bethel), Oscarville Traditional Village, Native Village of Paimiut, Pilot Station Traditional Village, Native Village of Pitka's Point, Village of Red Devil, Native Village of Scammon Bay, Shageluk Native Village, Native Village of Sheldon's Point (aka Nunam Iqua), Village of Sleetmute, Village of Stony River, Nunakauyarmiut Tribe (aka Native Village of Toksook Bay), Tuluksak Native Community, Native Village of Tuntutuliak, Native Village of Tununak, Umkumiute Native Village.

that provides a wide array of inpatient and outpatient medical services, dental care, mental health counseling and treatment, and environmental health services.

43.    YKHC's region covers approximately 75,000 square miles, and is a roadless area roughly the size of South Dakota.  The overwhelming majority of the region's 30,000 inhabitants are Yupik, Cupik, and Athabascan.

44.    The opioid crisis is straining YKHC's ability to provide adequate services to the persons it serves.  With its limited resources, YKHC has been forced to divert funds away from other priorities.

**Arctic Slope Native Association**

45.    Plaintiff Arctic Slope Native Association ("ASNA") is a nonprofit tribal health and social services organization serving eight federally recognized tribes[5] and other residents of the North Slope Borough.  Spanning the northernmost region of Alaska, this service area covers approximately 95,000 square miles.  ASNA serves Alaska Native, American Indian, and other residents across this region.  The majority of the region's residents are Alaska Native.

46.    ASNA operates a 14-bed critical access hospital in Utqiaġvik, Alaska, which provides inpatient and outpatient medical care, including emergency care, specialty clinics, and over 12,000 annual primary care visits.  While centered in Utqiaġvik, ASNA's healthcare delivery system reaches patients across the North Slope Borough.  In addition, ASNA provides a wide range of social services across its service area, including job training and placement, higher education scholarships, adult vocational training, family preservation and child welfare services,

---

[5] Village of Anaktuvuk Pass, Atqasuk Village (aka Atkasook), Kaktovik Village (aka Barter Island), Native Village of Nuiqsut (aka Nooiksut), Native Village of Point Hope, Native Village of Point Lay, Native Village of Barrow Inupiat Traditional Government (aka Utqiaġvik), Village of Wainwright.

Indian Child Welfare assistance, behavioral health education, childcare, elder care, burial assistance, and medical travel assistance.

47.     The opioid crisis is straining ASNA's ability to provide adequate services to the persons it serves.  With its limited resources, ASNA has been forced to divert funds away from other priorities.

**Eastern Aleutian Tribes**

48.     Plaintiff Eastern Aleutian Tribes ("EAT") is an intertribal organization formed and duly authorized by seven tribes[6] to provide health services in eight Alaska communities located in the Aleutian Islands, the Alaska Peninsula, and Prince William Sound.[7]

49.     EAT operates seven tribal health clinics and one other federally qualified health clinic.  EAT is the only health care provider in all but one of the eight communities in which it operates.[8]  As a result, EAT provides services to both IHS beneficiaries and non-beneficiaries in those communities.  EAT's services include primary medical care, behavioral health care, and dental care services.

50.     The region served by EAT encompasses more than 100,000 square miles across remote Alaska.  EAT serves a combined population of over 4,000 people, about sixty percent of whom are Alaska Native.  On average, EAT has approximately 9,000 patient visits annually.

---

[6] EAT is authorized by the Agdaagux Tribe of King Cove, Native Village of Akutan, Native Village of False Pass, Native Village of Nelson Lagoon, Native Village of Unga, the Pauloff Harbor Tribe, and the Qagan Tayagungin Tribe of Sand Point.

[7] EAT serves the communities of Adak, Akutan, Cold Bay, False Pass, King Cove, Nelson Lagoon, Sand Point, and Whittier.

[8] In Akutan, a private company operates a clinic for its employees.  In other communities, EAT provides health care services to cannery employees.

51.     The opioid crisis is straining EAT's ability to provide adequate services to the persons it serves.  With its limited resources, EAT has been forced to divert funds away from other priorities.

52.     TCC, Chugachmiut, CRNA, YKHC, ASNA, EAT, and the Kenaitze Indian Tribe each provide health care and related services to Alaska Natives and American Indians within their service areas, pursuant to the Alaska Tribal Health Compact under Title V of the Indian Self Determination and Education Assistance Act, 25 U.S.C. §§ 5301–5423.  In addition to the services funded through the Alaska Tribal Health Compact, each of these Plaintiffs supplements ISDEAA funding with significant funds from other sources, allowing them to provide expanded services to the people they serve.

**C.      Defendant**

53.     Defendant McKinsey and Company, Inc. is a corporation organized under the laws of the state of New York. McKinsey's principal place of business is located at 711 Third Avenue, New York, NY 10017.

54.     McKinsey is a worldwide management consultant company. From approximately 2004-2019, McKinsey provided consulting services to Purdue Pharma L.P., working to maximize sales of OxyContin and knowingly perpetuating the opioid crisis. McKinsey has provided related consulting services to other manufacturers of opioids.

**IV.     FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS**

**A.      The Corporate Integrity Agreement**

55.     In May of 2007, Purdue Frederick Company, the parent company of Purdue Pharma L.P. ("Purdue"), pleaded guilty to charges for misleading regulators, doctors, and the public regarding Purdue's opioid OxyContin. In pleading guilty, Purdue admitted to falsely marketing OxyContin as a less addictive, safer alternative to other pain medications.

56.     In the global settlement resolution, Purdue and its parent company paid over $600 million and entered into a Corporate Integrity Agreement with the U.S. Department of Health and Human Services Office of Inspector General.

57.     Under the Corporate Integrity Agreement, for five years, Purdue was required to refrain from making any deceptive or misleading claims about OxyContin and was obligated to submit regular compliance reports regarding its sales and marketing practices. Purdue was also required to monitor, report, and attempt to prevent inappropriate prescribing practices.

**B.**     **McKinsey's Role Following the Corporate Integrity Agreement**

**1.**     **The Sacklers seek to divert money to themselves.**

58.     The Sackler family is among the richest families in the United States. Members of the Sackler family have controlled Purdue at all times relevant to this complaint.

59.     Following the guilty plea, the Sacklers sought to insulate themselves from the risk they perceived in Purdue. Email threads between the Sacklers in early 2008 indicate that the Sacklers had become concerned about personal liability regarding opioid-related misconduct.

60.     The Sacklers considered selling Purdue or merging with another pharmaceutical company as an option for limiting their risk. Mortimer Sackler Jr. advocated for a sale or merger in a February 21, 2008 email to Dr. Richard Sackler (a former president and co-chairman of Purdue) and several others, writing "[t]he pharmaceutical industry has become far too volatile and risky for a family to hold 95% of its wealth in. It simply is not prudent for us to stay in the business given the future risks we are sure to face and the impact they will have on the shareholder value of the business and hence the family's wealth." The risk he referred to was, at least in significant part, further liability related to misconduct in the marketing and sale of OxyContin.

61.     Alternatively, the Sacklers considered extracting as much wealth as possible from Purdue through distributions to themselves as shareholders. Such distributions would allow the Sacklers to diversify their assets and make their wealth less vulnerable to judgments regarding Purdue's sales and marketing of opioids, including OxyContin.

62.     Either option -- a sale or significant distributions to shareholders -- would require Purdue to increase profitability in the short term. Purdue turned to McKinsey, with which it had an existing business relationship, for help maximizing sales of OxyContin given the requirements of the Corporate Integrity Agreement and the scrutiny that came along with it.

### 2. McKinsey supplied Purdue with Granular Sales and Marketing Strategies and Remained Intimately Involved in Implementation

63.     McKinsey touts its model of engaging in transformational partnerships with its clients. Rather than giving one-off advice, McKinsey learns each client's business intimately and provides tailored, granular strategies.

64.     McKinsey had begun collaborating with Purdue by June 2009.  McKinsey was tasked with increasing OxyContin sales despite the Corporate Integrity Agreement, which required, among other things, that Purdue comport with FDA requirements and also included increased review and reporting obligations.

65.     McKinsey provided sales and marketing strategies designed to sell as much OxyContin as possible, at one point in 2010 telling Purdue that the new strategies McKinsey had developed could generate as much as $400,000,000 in additional annual sales. McKinsey worked with Purdue to implement the strategies, with McKinsey's ongoing and extensive involvement.

66.     OxyContin sales grew dramatically, and the Sacklers diverted the resulting profits into other holdings.

67.     In a 2009 report, among other sales strategies, McKinsey advised Purdue sales representatives to push the highest dosages of OxyContin, which were the most profitable for Purdue. In order to maximize dosages and improve targeting of the coordinated marketing strategy, McKinsey investigated the prescribing habits of individual physicians.

68.     McKinsey helped shape Purdue's OxyContin marketing, which misleadingly centered on freedom and peace of mind for users. The marketing was tailored to avoid running directly afoul of the Corporate Integrity Agreement, but it remained misleading given what Purdue and McKinsey knew about opioids. One advertisement said, "we sell hope in a bottle," despite the fact that both McKinsey and Purdue already understood the addiction problems associated with opioid use and abuse.  McKinsey encouraged Purdue to tell doctors that OxyContin would give their patients "the best possible chance to live a full and active life."

69.     McKinsey urged Purdue to train and incentivize its sales representatives to increase sales across the market for opioids, even if sales went to Purdue's competitors. This was intended to serve the Sackler family's goal of increasing the marketability of Purdue for potential mergers, but it had the effect of worsening the opioid crisis even beyond the portion of the crisis directly attributable to sales and use of OxyContin.

**C.    Project Turbocharge**

70.     The Corporate Integrity Agreement expired in 2012.  With this restriction lifted, McKinsey devised additional marketing and sales strategies for Purdue to further increase OxyContin sales.

71.     In the second half of 2013, McKinsey made recommendations to Purdue to increase OxyContin revenue, including "Turbocharging Purdue's Sales Engine."

72.     McKinsey's "Project Turbocharge" recommendations included revising the existing process for targeting high-prescribing physicians, with a shift from targeting solely on

the basis of prescription deciles to considering additional factors. Based on its analysis, McKinsey told Purdue that "[t]here is significant opportunity to slow the decline of OxyContin by calling on more high-value physicians" and that "[t]he revenue upside from sales re-targeting and adherence could be up to $250 million."

73.     Also as part of the "Project Turbocharge" recommendations, McKinsey determined and advised Purdue that the top half of prescribing physicians "write on average 25 times more scripts per prescriber" than the lower half.

74.     Despite knowing that then-recently-expired Corporate Integrity Agreement required Purdue to refrain from improperly incentivizing OxyContin sales, McKinsey also recommended increasing incentive compensation for incremental OxyContin prescriptions, advising Purdue that "[r]evision to incentive comp could better align reps to Purdue's economics."

75.     At the same time, McKinsey recommended decreasing training by six days a year in order to allow employees more time to make sales calls. Meanwhile, McKinsey advised Purdue to exercise closer control over its sales staff in order to generate more efficient physician targeting.

76.     Physician targeting proved effective. McKinsey advised Purdue that visiting high-prescribing doctors many times per year increased sales.

77.     McKinsey recommended that Purdue circumvent pharmacies entirely with a mail order program because enforcement by federal regulators was decreasing OxyContin dispensing through Walgreens.

78.     At the board level, McKinsey urged the Sacklers to impose a "revenue growth goal" on management.

79.     With McKinsey's ongoing involvement and advice, Purdue implemented McKinsey's recommendations discussed above, but rebranded the program from Project Turbocharge to Evolve to Excellence.

80.     McKinsey's efforts had the effect the Sacklers had asked McKinsey to achieve. Sales of OxyContin tripled in the years following the 2007 guilty plea, despite the restrictions imposed by the Corporate Integrity Agreement. According to the U.S. Department of Justice, "[f]rom 2010 to 2018, Purdue's profits were almost entirely driven by its success in selling OxyContin."

81.     The Sacklers did not sell Purdue or enter into a merger, but their goal of extracting wealth from the business was realized. The Sackler family has withdrawn over $10 billion from Purdue since 2008, including $1.7 billion in 2009 alone. These distributions were made possible by McKinsey's services and came at the expense of a deepening national opioid crisis.

### D.     McKinsey Knew About Dangers of Opioids and Acted to Maximize OxyContin Prescriptions Anyway

82.     McKinsey has a long history of consulting in the pharmaceutical industry. In addition to its work with Purdue, McKinsey has performed "opioid-related work" for Johnson & Johnson, Endo International, and Mallinckrodt Pharmaceuticals. For instance, a McKinsey PowerPoint presentation prepared for Johnson & Johnson recommended that Johnson & Johnson aggressively target and influence doctors treating back pain in order to increase opioid sales.

83.     Purdue's 2007 guilty plea put McKinsey on notice of Purdue's misconduct. By that time, McKinsey had access to public information indicating that OxyContin and other opioids pose significant risk of addiction and misuse.

84.     McKinsey's presentations to Purdue in 2013 included extensive discussion of doctors' concerns about opioid misuse and side effects, demonstrating McKinsey's awareness of the dangers of opioids. Rather than working to limit these disastrous effects, McKinsey treated doctors' misgivings as obstacles to confront with new messaging.

85.     McKinsey continued working with Purdue long after the severity of the opioid crisis was well known. In 2017, McKinsey proposed that Purdue pay CVS and other distributors of OxyContin rebates "for every OxyContin overdose attributable to pills they sold."

86.     A former McKinsey consultant described McKinsey's work with Purdue as "the banality of evil, M.B.A. edition...They knew what was going on. And they found a way to look past it, through it, around it, so as to answer the only questions they cared about: how to make the client money, and when the walls closed in, how to protect themselves."

87.     In a 2018 email thread, apparently fearing consequences for McKinsey's work with Purdue, two McKinsey senior partners who had participated in McKinsey's work advising Purdue discussed deleting documents related to opioids.

**E.      Purdue's 2020 Guilty Plea and McKinsey's Recent Statement**

88.     In October of 2020, Purdue once again reached an agreement (the "2020 Settlement Agreement") with the U.S. Department of Justice to enter a guilty plea related to its marketing of OxyContin. The agreement includes $8.3 billion in penalties from Purdue and $225 million from the Sackler family.

89.     In the 2020 Settlement Agreement, Purdue pleaded guilty to defrauding health agencies, violating anti-kickback laws, paying illegal kickbacks to doctors, and "using aggressive marketing tactics to convince doctors to unnecessarily prescribe opioids--frivolous prescriptions that experts say helped fuel a drug addiction crisis that has ravaged America for decades."

90.     The 2020 Settlement Agreement was entered by Purdue and the United States government. It explicitly states that it does not release Purdue of "[a]ny liability for claims of the states or Indian tribes."

91.     The 2020 Settlement Agreement includes a provision specifically reserving claims regarding "[a]ny liability of entities other than the [Purdue Bankruptcy] Debtors, including consultants."

92.     On December 5, 2020, McKinsey issued the following statement regarding its work with Purdue:

> *December 5, 2020*—As we look back at our client service during the opioid crisis, we recognize that we did not adequately acknowledge the epidemic unfolding in our communities or the terrible impact of opioid misuse and addiction on millions of families across the country. That is why last year we stopped doing any work on opioid-specific business, anywhere in the world.
>
> Our work with Purdue was designed to support the legal prescription and use of opioids for patients with legitimate medical needs, and any suggestion that our work sought to increase overdoses or misuse and worsen a public health crisis is wrong. That said, we recognize that we have a responsibility to take into account the broader context and implications of the work that we do. Our work for Purdue fell short of that standard.
>
> We have been undertaking a full review of the work in question, including into the 2018 email exchange which referenced potential deletion of documents. We continue to cooperate fully with the authorities investigating these matters.

93.     In recent weeks, McKinsey has settled opioid-related claims with 49 states, the District of Columbia, and five U.S. territories.

**F.      The Impact of the Opioid Crisis in Alaska**

94.     Since the late 1990s, the opioid crisis has impacted all regions of the country, including Alaska.

Complaint
2132207.4

- 19 -

95.     In recent years, Alaska has experienced a steady increase in overdose deaths annually.



96.     From 2010–2017, Alaska suffered 661 opioid-related deaths.  There were 100 such deaths identified in 2017.

97.     In 2012, Alaska's prescription opioid overdose death rate was more than double the rate in the United States.

98.     This in turn, has driven up the need for opioid-reversal drugs such as naloxone.



G.     **The Impact of Opioid Abuse, Addiction and Diversion on American Indians and Alaska Natives**

99.     There are 574 federally recognized Tribes in the United States, located within the borders of 35 states. They are diverse in terms of their size, geography, culture, and resources, but they share a status as sovereign governments responsible for the health and well-being of their citizens.

100.     Native Americans have disproportionately borne the toll of the opioid crisis.

101.     Native Americans suffer the highest per capita rate of opioid overdoses.

102.     According to the Indian Health Service ("IHS"), there has been a "four-fold increase in opioid overdoses from 1999 to 2013 among American Indians and Alaska Natives . . . [T]wice the rate of the general U.S. population."

103.     The CDC reported that the "rates of death from prescription opioid overdose among American Indian or Alaska Natives increased almost four-fold from 1.3 per 100,000 in 1999 to 5.1 per 100,000 in 2013."  By 2014, the CDC reported "8.4 per 100,000 Native Americans were dying of opioid overdoses, the highest number of any racial demographic."

104.     In 2014, Native Americans had the highest death rate from opioid overdoses out of any ethnic group in the country.

105.     The impact on Native American children is particularly devastating. In a study conducted to examine substance-related disorders among adolescents across racial and ethnic groups, "Racial/Ethnic Variations in Substance-Related Disorders Among Adolescents in the United States," the authors found, of 72,561 adolescents aged 12 to 17 years:

a.     Analgesic opioids were the second most commonly used illegal drug after marijuana;

b.      Analgesic opioid use was comparatively prevalent among Native American adolescents (9.7%);

c.      Native Americans have the highest prevalence of use (47.5%) and disorders (15.0%); and

d.      31.5% of Native Americans had substance-related disorders.

106.    The study concluded:

Native Americans have the highest prevalence of substance use and substance-related disorders, adding to evidence that young Native Americans are a vulnerable group facing numerous stressors, trauma, and health disparities (e.g., highest rate of suicide, underfunded systems of care, and lack of access to appropriate care). The results herein highlight a critical need for intervention to reduce their burdens from substance use and for policies to address presently underfunded systems of care and improve infrastructures linking behavioral and primary health care services. [footnotes omitted.]

107.    The CDC reported that approximately 1 in 10 Native American youths ages 12 or older used prescription opioids for nonmedical purposes in 2012, double the rate for white youth.

108.    The fact that adolescents are able to easily obtain prescription opioids through the black market created by opioid diversion highlights the direct impact on Plaintiffs and their tribal communities by Purdue and McKinsey's actions and inactions.

109.    Even the youngest members of tribal communities bear the consequences of the opioid abuse epidemic fueled by McKinsey's conduct working with Purdue and other manufacturers of opioids.  Between 2009 and 2012, "American Indian women [were] 8.7 times more likely to be diagnosed with maternal opiate dependence or abuse during pregnancy," compared to non-Hispanic women.  That translates into 1 in 10 pregnancies among American Indian women.  As a result, many tribal infants suffer from opioid withdrawal and Neonatal Abstinence Syndrome ("NAS").

110. Infants suffering from NAS are separated from their families and placed into the custody of the tribal child welfare services or receive other government services so they can be afforded medical treatment and be protected from drug-addicted parents.

111. The impact of NAS can be life-long. Most NAS infants are immediately transferred to a neonatal intensive care unit for a period of days, weeks, or even months. NAS can also require an emergency evacuation for care to save the infant's life. Such emergency transportation costs thousands of dollars for each occurrence.

112. Many NAS infants have short-term and long-term developmental issues that prevent them from meeting basic cognitive and motor-skills milestones. Many will suffer from vision and digestive issues; some are unable to attend full days of school. These disabilities follow these children through elementary school and beyond.

113. Many of the parents of these children continue to relapse into prescription opioid use and abuse, having an impact on their families and tribal communities for financial and other support.

**H. The Impact of McKinsey's Work with Opioid Manufacturers on Plaintiffs**

114. Plaintiffs' own experience treating opioids illustrates these national trends.

115. Indeed, Plaintiffs are currently facing a public health crisis that threatens to undermine the safety and wellbeing of their entire tribal communities. Overarching health, public safety and law enforcement concerns relate to, among others, prescription opioid drug abuse and major crimes involving opioid and drug use.

116. Plaintiffs are also impacted because access to substance abuse prevention, treatment, and recovery services is lacking due to unavailability of sufficient services and is complicated by the remote locations of many communities.

117.     The Centers for Disease Control reported that American Indians and Alaska Natives had the highest drug overdose death rates in 2015 and the largest percentage increase in the number of deaths over time from 1999-2015 compared to other racial and ethnic groups. During that time, deaths rose more than 500% among American Indians and Alaska Natives.  In addition, because of misclassification of race and ethnicity on death certificates, the actual number of deaths may be underestimated by up to 35%.

118.     Nonmedical use of opioids within American Indian and Alaskan Native youth over the age of 12 was reported to be twice the rate of Whites and three times the rate for African Americans.

119.     The opioid epidemic has escalated with devastating effects. McKinsey and Purdue's increasing distribution of opioids has caused substantial opiate-related substance abuse, hospitalization, and death.

120.     The use of prescription opioids often leads to the use of non-prescription opioids, such as heroin, a link that is now well-documented.  Heroin use in Alaska has also caused devastating addiction, abuse, and death. This is particularly concerning in light of the recent influx of synthetic fentanyl products.

121.     Prescription opioid abuse, addiction, morbidity, and mortality are hazards to public health and safety in the Alaska tribal communities.

122.     Burdens and costs related to the misuse, addiction, and/or overdose of opioids the Plaintiffs have borne include, but are not limited to, the following:

        a.     Emergency medical visits for opioid misuse, addiction, and/or overdose.

        b.     Emergency medical visits for infections, injuries, illnesses, and drug-seeking related to opioid misuse, addiction, and/or overdose.

c.      Hospitalizations related to the misuse, addiction, and/or overdose of opioids.

d.      Increased burdens and costs of administering and staffing of social services, including case workers and resources to aid (1) those members of the Plaintiffs' communities addicted to and/or dependent on opioids; (2) reintegration of tribal and village members into their family and community following treatment; (3) the abused or neglected children and elders whose guardians are addicted to and/or dependent on opioids; and (3) the many foster or adoptive guardians who take on the role of caretaker in their absence.

e.      Increased costs for testing of drug samples as part of the legal process.

f.      Care, education and support of pregnant women addicted to opioids and of their children born with NAS; including ongoing educational and developmental support to address the long-term consequences of fetal opioid exposure; and

g.      Treatment of victims and criminal offenders, including holistic community-based treatment programming and regular drug screening.

123.    Plaintiffs have consistently endorsed, supported, and committed staff, facilities, activities and financial resources to addressing and responding to the opioid epidemic impacting their communities.

I.      **Tolling of Statutes of Limitations**

1.      **Equitable Estoppel and Fraudulent Concealment**

124.    McKinsey is equitably estopped from relying upon a statute of limitations defense because, alongside Purdue, McKinsey undertook active efforts to deceive Plaintiffs and to purposefully conceal their unlawful conduct and fraudulently assure the public and Plaintiffs that they were undertaking efforts to comply with their obligations under the state and federal controlled substances laws, all with the goal of protecting their registered manufacturer or

distributor status in the State and to continue generating profits. Notwithstanding the allegations set forth above, McKinsey and Purdue affirmatively assured the public and Plaintiffs that they were working to curb the opioid epidemic.

125. McKinsey and Purdue were deliberate in taking steps to conceal their conspiratorial behavior and active role in the deceptive marketing and the oversupply of opioids through overprescribing and suspicious sales, all of which fueled the opioid epidemic.

126. McKinsey's consulting services were given confidentially, and both McKinsey and Purdue concealed the content of those services from the public.

127. McKinsey and Purdue also concealed from Plaintiffs the existence of Plaintiffs' claims by hiding their lack of cooperation with law enforcement and affirmatively seeking to convince the public that Purdue's legal duties to report suspicious sales had been satisfied through public assurances that they were working to curb the opioid epidemic. They publicly portrayed themselves as committed to working diligently with law enforcement and others to prevent diversion of these dangerous drugs and curb the opioid epidemic, and they made broad promises to change their ways insisting they were good corporate citizens. These repeated misrepresentations misled regulators, prescribers and the public, including Plaintiffs, and deprived Plaintiffs of actual or implied knowledge of facts sufficient to put Plaintiffs on notice of potential claims.

128. Plaintiffs did not discover the nature, scope and magnitude of McKinsey's misconduct, and its full impact on Plaintiffs, and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

129.    Purdue and McKinsey's campaign to misrepresent and conceal the truth about the opioid drugs that they were aggressively pushing on Plaintiffs deceived the medical community, consumers, and Plaintiffs.

130.    Further, Purdue and other opioid manufacturers also concealed and prevented discovery of information, including data from the ARCOS database.

131.    McKinsey intended that their actions and omissions made with Purdue would be relied upon, including by Plaintiffs.  Plaintiffs did not know and did not have the means to know the truth, due to McKinsey and Purdue's actions and omissions.

132.    Plaintiffs reasonably relied on McKinsey and Purdue's affirmative statements regarding their purported compliance with their obligations under the law and consent orders.

### 2.    McKinsey and Purdue Persisted in The Fraudulent Scheme Despite a Guilty Plea and Large Fine

133.    In May 2007, Purdue and three of its executives pled guilty to federal charges of misbranding OxyContin in what the company acknowledged was an attempt to mislead doctors about the risk of addiction.  Purdue was ordered to pay $600 million in fines and fees.  In its plea, Purdue admitted that its promotion of OxyContin was misleading and inaccurate, misrepresented the risk of addiction and was unsupported by science.  Additionally, Michael Friedman, the company's president, pled guilty to a misbranding charge and agreed to pay $19 million in fines; Howard R. Udell, Purdue's top lawyer, also pled guilty and agreed to pay $8 million in fines; and Paul D. Goldenheim, its former medical director, pled guilty as well and agreed to pay $7.5 million in fines.

134.    Nevertheless, even after the settlement, Purdue continued to pay doctors on speakers' bureaus to promote the liberal prescribing of OxyContin for chronic pain and fund seemingly neutral organizations to disseminate the message that opioids were non-addictive as

well as other misrepresentations.  At least until early 2018, Purdue continued to deceptively market the benefits of opioids for chronic pain while diminishing the associated dangers of addiction.  After Purdue made its guilty plea in 2007, it assembled an army of lobbyists to fight any legislative actions that might encroach on its business.  Between 2006 and 2015, Purdue and other painkiller producers, along with their associated nonprofits, spent nearly $900 million dollars on lobbying and political contributions— eight times what the gun lobby spent during that period. McKinsey participated extensively in these actions and provided Purdue with strategies and assistance to maximize sales as described in this complaint.

135.    As all of the government actions against the Purdue and McKinsey demonstrate, McKinsey knew that the actions it took with Purdue were unlawful, and yet deliberately proceeded in order to increase Purdue's sales and profits, and in turn to serve McKinsey's financial interests.

## V.      FACTUAL ALLEGATIONS PERTAINING TO CLAIMS UNDER THE RACKETTER-INFLUENCED AND CURRPOT ORGANIZATIONS (RICO) ACT: THE OPIOID MARKETING ENTERPRISE

### A.      The Common Purpose and Scheme of the Opioid Marketing Enterprise

136.    Knowing that their products were highly addictive, ineffective and unsafe for the treatment of long-term chronic pain, non-acute and non-cancer pain, McKinsey, which participated in the marketing and sale of opioids as described in this complaint, and manufacturers of opioids, including Purdue, Johnson & Johnson, Cephalon, Janssen, Endo, and Mallinckrodt (collectively, including McKinsey, the "Opioid Marketing Enterprise Members") formed an association-in-fact enterprise and engaged in a scheme to unlawfully increase their profits and sales, and grow their share of the prescription painkiller market, through repeated and systematic misrepresentations about the safety and efficacy of opioids for treating long-term chronic pain.

137.    In order to unlawfully increase the demand for opioids, the Opioid Marketing Enterprise Members formed an association-in-fact enterprise (the "Opioid Marketing Enterprise").  Through their personal relationships, the members of the Opioid Marketing Enterprise had the opportunity to form and take actions in furtherance of the Opioid Marketing Enterprise's common purpose.  The Opioid Marketing Enterprise Members' substantial financial contribution to the Opioid Marketing Enterprise, and the advancement of opioids-friendly messaging, fueled the U.S. opioids epidemic.

138.    The Opioid Marketing Enterprise Members, through the Opioid Marketing Enterprise, concealed the true risks and dangers of opioids from the medical community and the public, including Plaintiffs, and made misleading statements and misrepresentations about opioids that downplayed the risk of addiction and exaggerated the benefits of opioid use.  The misleading statements included: (1) that addiction is rare among patients taking opioids for pain; (2) that addiction risk can be effectively managed; (3) that symptoms of addiction exhibited by opioid patients are actually symptoms of an invented condition the Opioid Marketing Enterprise Members named "pseudoaddiction"; (4) that withdrawal is easily managed; (5) that increased dosing presents no significant risks; (6) that long-term use of opioids improves function; (7) that the risks of alternative forms of pain treatment are greater than the adverse effects of opioids; (8) that use of time-released dosing prevents addiction; (9) that abuse-deterrent formulations provide a solution to opioid abuse; and (10) that opioids would bring patients freedom and peace of mind.

139.    The scheme devised, implemented and conducted by the Opioid Marketing Enterprise Members was a common course of conduct designed to ensure that the Opioid Marketing Enterprise Members unlawfully increased their sales and profits through concealment

and misrepresentations about the addictive nature and effective use of the Opioid Marketing Enterprise Members' drugs.  The Opioid Marketing Enterprise Members acted together for a common purpose and perpetuated the Opioid Marketing Enterprise's scheme, including through the unbranded promotion and marketing network as described above.

140.    There was regular communication between the Opioid Marketing Enterprise Members in which information was shared, misrepresentations were coordinated, and payments were exchanged. The Opioid Marketing Enterprise Members functioned as a continuing unit for the purpose of implementing the Opioid Marketing Enterprise's scheme and common purpose, and each agreed and took actions to hide the scheme and continue its existence.

141.    As public scrutiny and media coverage focused on how opioids ravaged communities in throughout the United States, McKinsey did not challenge Purdue or other manufacturers' misrepresentations, seek to correct their previous misrepresentations, terminate their role in the Opioid Marketing Enterprise, nor disclose publicly that the risks of using opioids for chronic pain outweighed their benefits and were not supported by medically acceptable evidence. Instead, McKinsey continued to participate in the Opioid Marketing Enterprise for financial gain.

142.    The Opioid Marketing Enterprise Members engaged in certain discrete categories of activities in furtherance of the common purpose of the Opioid Marketing Enterprise. The Opioid Marketing Enterprise's conduct in furtherance of the common purpose of the Opioid Marketing Enterprise involved misrepresentations regarding the risk of addiction and safe use of prescription opioids for long-term chronic pain.

143.    The impact of the Opioid Marketing Enterprise's scheme is still in place—*i.e.*, the opioids continue to be prescribed and used for chronic pain throughout the area of Plaintiffs, and the epidemic continues to injure Plaintiffs, and consume Plaintiffs' resources.

144.    As a result, it is clear that the Opioid Marketing Enterprise Members, including McKinsey, were each willing participants in the Opioid Marketing Enterprise, had a common purpose and interest in the object of the scheme, and functioned within a structure designed to effectuate the Enterprise's purpose.

### B.    The Conduct of the Opioid Marketing Enterprise Violated Civil RICO

145.    From at least 2004 to the present, each of the Opioid Marketing Enterprise Members exerted control over the Opioid Marketing Enterprise and participated in the operation or management of the affairs of the Opioid Marketing Enterprise, directly or indirectly, in the following ways:

a.    Creating and providing a body of deceptive, misleading and unsupported medical and popular literature about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

b.    Creating and providing a body of deceptive, misleading and unsupported electronic and print advertisements about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

c.    Creating and providing a body of deceptive, misleading and unsupported sales and promotional training materials about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

       d.      Devised and implemented marketing schemes that included targeting and misleading physicians, unlawfully incentivizing sales representatives to maximize prescriptions and dosages, and evading regulatory constraints.

       e.      Disseminating many of their false, misleading, imbalanced, and unsupported statements through unbranded materials that appeared to be independent publications; and

       f.      Using front groups and key opinion leaders ("KOLs") to mislead the public about opioids.

146.    The scheme devised and implemented by the Opioid Marketing Enterprise Members amounted to a common course of conduct intended to increase the Opioid Marketing Enterprise Members' sales from prescription opioids by encouraging the prescribing and use of opioids for long-term chronic pain.  The scheme was a continuing course of conduct, and many aspects of it continue through to the present.

**C.**    **Pattern of Racketeering Activity**

147.    The Opioid Marketing Enterprise Members' scheme described herein was perpetrated, in part, through multiple acts of mail fraud and wire fraud, constituting a pattern of racketeering activity as described herein.

148.    The pattern of racketeering activity used by the Opioid Marketing Enterprise Members and the Opioid Marketing Enterprise likely involved thousands of separate instances of the use of the U.S. Mail or interstate wire facilities in furtherance of the unlawful Opioid Marketing Enterprise, including essentially uniform misrepresentations, concealments and material omissions regarding the beneficial uses and non-addictive qualities for the long-term treatment of chronic, non-acute and non-cancer pain, with the goal of profiting from increased sales of the Opioid Marketing Enterprise Members' drugs induced by consumers, prescribers,

regulators and Plaintiffs' reliance on the Opioid Marketing Enterprise Members' misrepresentations.

149.    Each of these fraudulent mailings and interstate wire transmissions constitutes racketeering activity and collectively, these violations constitute a pattern of racketeering activity, through which the Opioid Marketing Enterprise Members defrauded and intended to defraud Plaintiffs, and other intended victims.

150.    The Opioid Marketing Enterprise Members devised and knowingly carried out an illegal scheme and artifice to defraud by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts regarding the safe, non-addictive and effective use of opioids for long-term chronic, non-acute and non-cancer pain.  The Opioid Marketing Enterprise Members and members of the Opioid Marketing Enterprise knew that these representations violated the FDA approved use these drugs, and were not supported by actual evidence.  The Opioid Marketing Enterprise Members intended that their common purpose and scheme to defraud would, and did, use the U.S. Mail and interstate wire facilities, intentionally and knowingly with the specific intent to advance, and for the purpose of executing, their illegal scheme.

151.    By intentionally concealing the material risks and affirmatively misrepresenting the benefits of using opioids for chronic pain, to, prescribers, regulators and the public, including Plaintiffs, the Opioid Marketing Enterprise Members engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

152.    The Opioid Marketing Enterprise Members' use of the U.S. Mail and interstate wire facilities to perpetrate the opioids marketing scheme involved thousands of

communications, publications, representations, statements, electronic transmissions, payments, including, *inter alia*:

a.     Marketing materials about opioids, and their risks and benefits, which the Opioid Marketing Enterprise Members sent to health care providers, transmitted through the internet and television, published, and transmitted to front groups and KOLs located across the country and Plaintiffs;

b.     Written representations and telephone calls among the Opioid Marketing Enterprise Members, and between the Opioid Marketing Enterprise Members and front groups, regarding the misrepresentations, marketing statements and claims about opioids, including the non-addictive, safe use of chronic long-term pain generally;

c.     Written representations and telephone calls among the Opioid Marketing Enterprise Members, and between the Opioid Marketing Enterprise Members and KOLs regarding the misrepresentations, marketing statements and claims about opioids, including the non-addictive, safe use of chronic long-term pain generally

d.     E-mails, telephone and written communications among the Opioid Marketing Enterprise Members, and between the Opioid Marketing Enterprise Members and the front groups agreeing to or implementing the opioids marketing scheme;

e.     E-mails, telephone and written communications among the Opioid Marketing Enterprise Members, and between the Opioid Marketing Enterprise Members and the KOLs agreeing to or implementing the opioids marketing scheme;

f.     Communications among the Opioid Marketing Enterprise Members, and between the Opioid Marketing Enterprise Members, front groups and the media regarding

publication, drafting of treatment guidelines, and the dissemination of the same as part of the

Opioid Marketing Enterprise;

g.     Communications among the Opioid Marketing Enterprise Members, and between the Opioid Marketing Enterprise Members, KOLs and the media regarding publication, drafting of treatment guidelines, and the dissemination of the same as part of the Opioid Marketing Enterprise;

h.     Written and oral communications directed to Plaintiffs and/or its members and that fraudulently misrepresented the risks and benefits of using opioids for chronic pain; and

i.     Receipts of increased profits sent through the U.S. Mail and interstate wire facilities—the wrongful proceeds of the scheme.

153.     In addition to the above-referenced predicate acts, it was intended by and foreseeable to the Opioid Marketing Enterprise Members that the front groups and the KOLs would distribute publications through the U.S. Mail and by interstate wire facilities, and, in those publications, claim that the benefits of using opioids for chronic pain outweighed the risks of doing so.

154.     To achieve the common goal and purpose of the Opioid Marketing Enterprise, the Opioid Marketing Enterprise Members and members of the Opioid Marketing Enterprise hid from the consumers, prescribers, regulators and the Plaintiffs: (a) the fraudulent nature of the Opioid Marketing Enterprise Members' marketing scheme; (b) the fraudulent nature of statements made by the Opioid Marketing Enterprise Members and by their KOLs, front groups and other third parties regarding the safety and efficacy of prescription opioids; and (c) the true nature of the relationship between the members of the Opioid Marketing Enterprise.

155.    The Opioid Marketing Enterprise Members, and each member of the Opioid Marketing Enterprise agreed, with knowledge and intent, to the overall objective of the Opioid Marketing Enterprise Members' fraudulent scheme and participated in the common course of conduct to commit acts of fraud and indecency in marketing prescription opioids.

156.    Indeed, for the Opioid Marketing Enterprise Members' fraudulent scheme to work, each of them had to agree to implement similar tactics regarding fraudulent marketing of prescription opioids.  This conclusion is supported by the fact that opioid manufacturers among the Opioid Marketing Enterprise Members financed, supported, and worked through the same KOLs and Front groups, and often collaborated on and mutually supported the same publications, CMEs, presentations, and prescription guidelines.

The Opioid Marketing Enterprise Members' predicate acts all had the purpose of creating the opioid epidemic that substantially injured Plaintiffs' business and property, while simultaneously generating billion-dollar revenue and profits for the Opioid Marketing Enterprise Members.  The predicate acts were committed or caused to be committed by the Opioid Marketing Enterprise Members through their participation in the Opioid Marketing Enterprise and in furtherance of its fraudulent scheme.

## VI.    CAUSES OF ACTION

### A.    Racketeer Influenced and Corrupt Organizations (RICO), 18 U.S.C. § 1961, et. seq.

157.    Plaintiffs incorporate by reference all preceding paragraphs of this complaint as if fully set forth herein, and further allege as follows:

158.    This claim is brought by Plaintiffs against Defendant McKinsey for actual damages, treble damages, and equitable relief under 18.U.S.C. § 1964, for violations of 18 U.S.C. § 1961, et seq.

159.    At all relevant times, McKinsey is and has been a "person" under 18 U.S.C. § 1961(3) because it is capable of holding, and does hold, "a legal or beneficial interest in property."

160.    Each Plaintiff is a "person," as that term is defined in 18 U.S.C. § 1961(3), and has standing to sue as it was and is injured in its business and/or property as a result of Defendant's wrongful conduct described herein.

161.    The Opioid Marketing Enterprise conducted an association-in-fact enterprise, and/or participated in the conduct of an enterprise through a pattern of illegal activities (the predicate racketeering acts of mail and wire fraud) to carry-out the common purpose of the Opioid Marketing Enterprise, i.e., to unlawfully increase profits and revenues from the continued prescription and use of opioids for long-term chronic pain.  Through the racketeering activities of the Opioid Marketing Enterprise, the Opioid Marketing Enterprise Members sought to further the common purpose of the enterprise through a fraudulent scheme to change prescriber habits and public perception about the safety and efficacy of opioid use.  In so doing, each of the Opioid Marketing Enterprise Members knowingly conducted and participated in the conduct of the Opioid Marketing Activities by engaging in mail and wire fraud in violation of 18 U.S.C. §§ 1962(c) and (d).

162.    The Opioid Marketing Enterprise is an association-in-fact enterprise that consists of the Opioid Marketing Enterprise Members.

163.    Each of the Opioid Marketing Enterprise Members conducted and participated in the conduct of the Opioid Marketing Enterprise by playing a distinct role in furthering the enterprise's common purpose of increasing profits and sales through the knowing and intentional dissemination of false and misleading information about the safety and efficacy of long-term

opioid use, and the risks and symptoms of addiction, in order to increase the market for prescription opioids by changing prescriber habits and public perceptions.

164.    Specifically, the Opioid Marketing Enterprise Members each worked together to coordinate the enterprise's goals and conceal their role, and the enterprise's existence, from the public by, among other things, (i) funding, editing and distributing publications that supported and advanced their false messages; (ii) funding KOLs to further promote their false messages; and (iii) tasking their own employees to direct deceptive marketing materials and pitches directly at physicians.

165.    Further, each of the Opioid Marketing Enterprise Members had systematic links to and personal relationships with each other through joint participation in lobbying groups, trade industry organizations, contractual relationships and continuing coordination of activities.  The systematic links and personal relationships that were formed and developed allowed members of the Opioid Marketing Enterprise the opportunity to form the common purpose and agree to conduct and participate in the conduct of the Opioid Marketing Enterprise.  Specifically, each of the Opioid Marketing Enterprise Members, including McKinsey working with and through the other Opioid Marketing Enterprise Members, coordinated their efforts through the same KOLs and front groups, based on their agreement and understanding that the front groups and KOLs were industry friendly and would work together with the Opioid Marketing Enterprise Members to advance the common purpose of the Opioid Marketing Enterprise; and each of the individuals and entities who formed the Opioid Marketing Enterprise acted to enable the common purpose and fraudulent scheme of the Opioid Marketing Enterprise.

166.    At all relevant times, the Opioid Marketing Enterprise: (a) had an existence separate and distinct from each RICO Marketing Defendant and its members; (b) was separate

and distinct from the pattern of racketeering in which the Opioid Marketing Enterprise Members engaged; (c) was an ongoing and continuing organization consisting of individuals, persons, and legal entities, including each of the Opioid Marketing Enterprise Members; (d) was characterized by interpersonal relationships between and among each member of the Opioid Marketing Enterprise; and (e) had sufficient longevity for the enterprise to pursue its purpose and functioned as a continuing unit.

167.    The Opioid Marketing Enterprise Members conducted and participated in the conduct of the Opioid Marketing Enterprise through a pattern of racketeering activity that employed the use of mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud), to increase profits and revenue by changing prescriber habits and public perceptions in order to increase the prescription and use of prescription opioids, and expand the market for opioids.

168.    The Opioid Marketing Enterprise Members each committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity (i.e. violations of 18 U.S.C. §§ 1341 and 1343) within the past ten years.  The multiple acts of racketeering activity that the Opioid Marketing Enterprise Members committed, or aided and abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity."  The racketeering activity was made possible by the Opioid Marketing Enterprise Members' regular use of the facilities, services, distribution channels, and employees of the Opioid Marketing Enterprise, the U.S. Mail and interstate wire facilities.  The Opioid Marketing Enterprise Members participated in the scheme to defraud by using mail, telephones and the Internet to transmit mailings and wires in interstate or foreign commerce.

169.     The Opioid Marketing Enterprise Members' predicate acts of racketeering (18

U.S.C. § 1961(1)) include, but are not limited to:

a.     Mail Fraud: The Opioid Marketing Enterprise Members violated 18

U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via

U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to

design, manufacture, market, and sell the prescription opioids by means of false pretenses,

misrepresentations, promises, and omissions.

b.     Wire Fraud: The Opioid Marketing Enterprise Members violated 18

U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received,

materials by wire for the purpose of executing the unlawful scheme to design, manufacture,

market, and sell the prescription opioids by means of false pretenses, misrepresentations,

promises, and omissions.

170.     Indeed, as summarized herein, the Opioid Marketing Enterprise Members used

the mail and wires to send or receive thousands of communications, publications,

representations, statements, electronic transmissions and payments to carry-out the Opioid

Marketing Enterprise's fraudulent scheme.

171.     Because the Opioid Marketing Enterprise Members disguised their participation

in the enterprise, and worked to keep even the enterprise's existence secret so as to give the false

appearance that their false messages reflected the views of independent third parties, many of the

precise dates of the Opioid Marketing Enterprise's uses of the U.S. Mail and interstate wire

facilities (and corresponding predicate acts of mail and wire fraud) have been hidden and cannot

be alleged without access to the books and records maintained by the Opioid Marketing

Enterprise Members, front groups, and KOLs.  Indeed, an essential part of the successful

operation of the Opioid Marketing Enterprise alleged herein depended upon secrecy.  However, Plaintiffs have described the occasions on which the Opioid Marketing Enterprise Members disseminated misrepresentations and false statements to consumers, prescribers, regulators, and Plaintiffs, and how those acts were in furtherance of the scheme.

172.    Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including consumers, prescribers, regulators and Plaintiffs.  The Opioid Marketing Enterprise Members calculated and intentionally crafted the scheme and common purpose of the Opioid Marketing Enterprise to ensure their own profits remained high. In designing and implementing the scheme, the Opioid Marketing Enterprise Members understood and intended that those in the distribution chain rely on the integrity of the pharmaceutical companies and ostensibly neutral third parties to provide objective and scientific evidence regarding the Opioid Marketing Enterprise Members' products.

173.    The Opioid Marketing Enterprise Members' pattern of racketeering activity alleged herein and the Opioid Marketing Enterprise are separate and distinct from each other. Likewise, the Opioid Marketing Enterprise Members are distinct from the Opioid Marketing Enterprise.

174.    The racketeering activities conducted by the Opioid Marketing Enterprise Members amounted to a common course of conduct, with a similar pattern and purpose, intended to deceive consumers, prescribers, regulators and the Plaintiffs.  Each separate use of the U.S. Mail and/or interstate wire facilities employed by Defendant was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including consumers, prescribers, regulators and the Plaintiffs.  The

Opioid Marketing Enterprise Members have engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the Opioid Marketing Enterprise.

175.     Each of the Opioid Marketing Enterprise Members aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses.

176.     As described herein, the Opioid Marketing Enterprise Members engaged in a pattern of related and continuous predicate acts for years.  The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant money and revenue from the marketing and sale of their highly addictive and dangerous drugs. The predicate acts also had the same or similar results, participants, victims, and methods of commission.  The predicate acts were related and not isolated events.

177.     The Opioid Marketing Enterprise Members' violations of law and their pattern of racketeering activity directly and proximately caused Plaintiffs injury in their business and property.  The Opioid Marketing Enterprise Members' pattern of racketeering activity logically, substantially and foreseeably caused an opioid epidemic.  Plaintiffs' injuries, as described below, were not unexpected, unforeseen or independent. Rather, as Plaintiffs allege, the Opioid Marketing Enterprise Members knew that the opioids were unsuited to treatment of long-term chronic, non-acute, and non-cancer pain, or for any other use not approved by the FDA, and knew that opioids were highly addictive and subject to abuse. Nevertheless, the Opioid Marketing Enterprise Members engaged in a scheme of deception that utilized the mail and wires in order to carry-out the Opioid Marketing Enterprises' fraudulent scheme, thereby increasing sales of their opioid products.

178.    It was foreseeable and expected that the Opioid Marketing Enterprise Members creating and then participating in the Opioid Marketing Enterprise through a pattern of racketeering activities to carry-out their fraudulent scheme would lead to a nationwide opioid epidemic, including increased opioid addiction and overdose.

179.    Defendant's misleading marketing and failure to prevent prescription opioid diversion damaged the Plaintiffs and their member tribes and villages.  Defendant's misconduct has contributed to a range of social problems, including violence and delinquency.  Adverse social outcomes include child neglect, family dysfunction, babies born addicted to opioids, criminal behavior, poverty, property damage, unemployment, and social despair.  As a result, more and more of Plaintiffs' resources are devoted to addiction-related problems.

180.    Specifically, the Opioid Marketing Enterprise Members' creation of, and then participation in, the Opioid Marketing Enterprise through a pattern of racketeering activities to carry-out their fraudulent scheme has injured Plaintiffs in the form of substantial losses of money and property that logically, directly and foreseeably arise from the opioid-addiction epidemic. Plaintiffs' injuries, as alleged throughout this complaint, and expressly incorporated herein by reference, include:

a.    Costs for providing healthcare and medical care, additional therapeutic, and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths;

b.    Costs of training first responders in the proper treatment of drug overdoses;

c.    Costs associated with providing first responders with naloxone—an opioid antagonist used to block the deadly effects of opioids in the context of overdose;

d.      Costs associated with emergency responses by first responders to opioid overdoses;

e.      Costs for providing mental-health services, treatment, counseling, rehabilitation services, and social services to victims of the opioid epidemic and their families;

f.      Costs for providing treatment of infants born with opioid-related medical conditions, or born dependent on opioids due to drug use by mother during pregnancy;

g.      Costs associated with the injuries to the health and welfare of the Plaintiffs' and their members caused by the opioid epidemic;

h.      Costs associated with providing care for children whose parents suffer from opioid-related disability or incapacitation;

i.      Losses caused by the diversion of revenue from Plaintiffs' businesses to address the opioid epidemic that would otherwise have been reinvested in Plaintiffs' businesses;

j.      Costs associated with removal of hazardous waste from Plaintiffs' communities, including on Plaintiffs' real property.

181.    Plaintiffs' injuries were directly and thus proximately caused by these racketeering activities because they were the logical, substantial and foreseeable cause of Plaintiffs' injuries.  But for the opioid-addiction epidemic the Opioid Marketing Enterprise Members created through their Opioid Marketing Enterprise, Plaintiffs would not have lost money or property, and the health and welfare of Plaintiffs and their members would not have been injured.

182.    Plaintiffs are the most directly harmed entities and there are no other Plaintiffs better suited to seek a remedy for the economic harms at issue here.

183.     Plaintiffs seek all legal and equitable relief as allowed by law, including, inter alia, actual damages; treble damages; equitable and/or injunctive relief in the form of court-supervised corrective communication, actions and programs; forfeiture as deemed proper by the Court; attorneys' fees; all costs and expenses of suit; and pre- and post-judgment interest, including, inter alia:

a.     Actual damages and treble damages, including pre-suit and post-judgment interest;

b.     An order enjoining any further violations of RICO;

c.     An order enjoining any further violations of any statutes alleged to have been violated in this Complaint;

d.     An order enjoining the commission of any tortious conduct, as alleged in this Complaint;

e.     An order enjoining any future marketing or misrepresentations regarding the health benefits or risks of prescription opioids use, except as specifically approved by the FDA;

f.     An order enjoining any future marketing of opioids through non-branded marketing including through front groups, KOLs, websites, or in any other manner alleged in this Complaint that deviates from the manner or method in which such marketing has been approved by the FDA;

g.     An order enjoining any future marketing to vulnerable populations, including but not limited to, persons over the age of fifty-five, anyone under the age of twenty-one, and veterans;

h.      An order requiring McKinsey to publicly disclose all documents, communications, records, data, information, research or studies related to its work with Purdue and other manufacturers of opioids;

i.      An order divesting McKinsey of any interest in, and the proceeds of any work related to opioids;

j.      Forfeiture as deemed appropriate by the Court; and

k.      Attorneys' fees and all costs and expenses of suit.

**B.      <u>Negligence under Alaska Law</u>**

184.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein, and further allege as follows:

185.    The opioid epidemic was a direct, legal, and proximate result of McKinsey's negligence. As a direct, proximate, and legal result of said negligence, Plaintiffs suffered damages as alleged herein.

186.    McKinsey, through its work with Purdue and other opioid manufacturers, owed Plaintiffs a duty to not expose Plaintiffs and their constituent tribes to an unreasonable risk of harm.

187.    McKinsey had a legal duty to exercise reasonable and ordinary care and skill in accordance with applicable standards of conduct in its work relating to marketing, selling and/or distributing opioids.

188.    McKinsey breached its duty to Plaintiffs by, inter alia, advising Purdue to implement sales and marketing strategies designed to increase sales of OxyContin.

189.    McKinsey breached its duty to Plaintiffs by working with Purdue to deceptively market opioids, including minimizing the risks of addiction and overdose and exaggerating the purported benefits of long-term use of opioids for the treatment of chronic pain.

190.    It was reasonably foreseeable that McKinsey's actions and omissions would result in the harm to Plaintiffs described herein.

191.    McKinsey's failure to comply with its duties of care proximately caused damage to Plaintiffs.

192.    The negligence of McKinsey was a substantial factor in causing Plaintiffs' damages. But for McKinsey's services, Purdue would not have been able to increase sales in the years following the 2007 guilty plea, including the five years under the Corporate Integrity Agreement and the years since its expiration.

193.    As a further direct and proximate result of McKinsey's negligence, Plaintiffs suffered damages including, but not limited to, economic loss, business loss, emotional distress, annoyance, disturbance, shame, inconvenience, drug addiction and/or dependency, and neonatal abstinence syndrome.

194.    There is moral blame attached to McKinsey as a result of the terrible injuries and suffering their misconduct caused, including the damage to Plaintiffs.

195.    Public policy supports finding a duty of care in this circumstance, and a finding of a duty of care on McKinsey will also deter McKinsey from engaging in such behavior in the future.

196.    Further, the conduct alleged against McKinsey in this complaint was despicable and subjected Plaintiffs to cruel and unjust hardship in conscious disregard of their rights, constituting oppression, for which McKinsey must be punished by punitive and exemplary damages in an amount according to proof. McKinsey's conduct evidences a conscious disregard for the safety and welfare of others, including Plaintiffs and Plaintiffs' members. McKinsey's conduct was and is outrageous, done with malice and evidenced reckless indifference to the

interests of the Plaintiffs and their members as set forth by Code of Civil Procedure § 09.17.020. An officer, director, or managing agent of McKinsey personally committed, authorized, and/or ratified the outrageous and wrongful conduct alleged in this complaint.

197.    Plaintiffs are without fault, and the injuries to Plaintiffs would not have happened in the ordinary course of events if McKinsey had used due care commensurate to the dangers involved in the distribution and dispensing of controlled substances.

198.    Plaintiffs are entitled to an award of punitive damages sufficient to punish and make an example of McKinsey.

C.    **Public Nuisance under Alaska Law**

199.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein, and further allege as follows:

200.    Section 821B of the Restatement (Second) Torts defines a "public nuisance" as "an unreasonable interference with a right common to the general public."

201.    This action is brought by the Plaintiffs to abate the public nuisance created by the McKinsey through its work with Purdue.

202.    McKinsey has created and/or assisted in the creation of a condition that significantly interferes with public health and public safety. McKinsey's conduct has produced a permanent or long-lasting effect, and McKinsey know its conduct has a significant effect upon the public right.

203.    The public nuisance is substantial and unreasonable. McKinsey's actions caused and continue to cause the public health epidemic described above and that harm outweighs any offsetting benefit.

204.    McKinsey knew and should have known that its promotion of opioids was false and misleading and that its deceptive marketing scheme and other unlawful, unfair, and

fraudulent actions would create or assist in the creation of the public nuisance—the opioid epidemic.

205.    McKinsey's actions were, at the very least, a substantial factor in opioids becoming widely available and widely used. McKinsey's actions were, at the very least, a substantial factor in deceiving doctors and patients about the risks and benefits of opioids for the treatment of chronic pain. Without McKinsey's actions, opioid use, misuse, abuse, and addiction would not have become so widespread, and the opioid epidemic that now exists would have been averted or much less severe.

206.    McKinsey has breached its duties to Plaintiffs by disseminating false and misleading information through Purdue regarding the dangers of opioid use and by targeting physicians likely to prescribe opioids for pain management despite the availability of other, less- or non-addictive pain killers.

207.    Working through Purdue, McKinsey unlawfully provided false or misleading material information about prescription opioids or unlawfully failed to use reasonable care or comply with statutory requirements in the distribution of prescription opioids.

208.    McKinsey's acts and omissions created the opioid epidemic and thereby caused injury to the health of Plaintiffs and Plaintiffs' members and interfered with the comfortable enjoyment of life and property of others, specifically the Plaintiffs and its members.

209.    McKinsey's acts and omissions offend decency and include the illegal sales of controlled substances.

210.    McKinsey's acts and omissions render Plaintiffs' members insecure.

211.    Plaintiffs did not consent, expressly or impliedly, to the wrongful conduct of McKinsey.

212.    McKinsey's acts and omissions affect the entire communities of the Plaintiffs.

213.    McKinsey's acts and omissions threatened and directly harmed the health and welfare of the Plaintiffs and their members.

214.    McKinsey also has a duty to abate the nuisance caused the by prescription opioid epidemic.

215.    The public nuisance created, perpetuated, and maintained by McKinsey can be abated and further recurrence of such harm and inconvenience can be abated.

216.    McKinsey has failed to abate the nuisance they created.

217.    Plaintiffs seek an order providing for abatement of the public nuisance that McKinsey created or assisted in the creation of, and enjoining McKinsey from future conduct creating a public nuisance.

218.    Plaintiffs seek damages from McKinsey to pay for the costs to permanently eliminate the hazards to public health and safety and abate the public nuisance.

219.    As a direct result of McKinsey's conduct, Plaintiffs and their communities have suffered actual injury and economic damages including, but not limited to, significant expenses for police, emergency, health, education and training, prosecution, child protection, corrections, judicial and other services.

220.    McKinsey is liable to Plaintiffs for the costs borne by Plaintiffs as a result of the opioid epidemic and for the costs of abating the nuisance created by McKinsey.

**D.      Fraud under Alaska Law**

221.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein, and further allege as follows:

222.    As alleged herein and throughout this Complaint, McKinsey, working through Purdue and other manufacturers of opioids, has made material misrepresentations concerning the

sale of prescription opioids, as well as false or misleading descriptions and representations of fact during the advertising and promotion of prescription opioids, and those material misrepresentations and false or misleading descriptions and representations of fact were knowingly or recklessly made.

223.    For instance, McKinsey, working through Purdue, made these material misrepresentations and false or misleading descriptions and representations of fact in an intentional effort to deceive and induce doctors and patients to prescribe and use prescription opioids for long-term chronic, non-acute, and non-cancer pain, and for other uses not approved by the FDA, despite McKinsey's knowledge that the opioids were unsuited to these treatments and that opioids were highly addictive and subject to abuse.

224.    McKinsey continued making these materials misrepresentations and omissions, and failed to correct them, despite repeated regulatory settlements and publications demonstrating the false nature of the Defendant's claims.

225.    Doctors, including those working in hospitals and clinics operated by Plaintiffs or serving the Plaintiffs and their members, relied on these misrepresentations and omissions in prescribing opioids for long-term chronic, non-acute, and non-cancer pain, and for other uses not approved by the FDA.

226.    Patients, including Plaintiffs' members, relied on the McKinsey's misrepresentations and omissions in taking prescription opioids for long-term chronic, non-acute, and non-cancer pain, and for other uses not approved by the FDA.

227.    McKinsey is liable to Plaintiffs for the damage McKinsey's material, uncorrected, and knowingly or recklessly made misrepresentations, omissions, and false statements have caused to Plaintiffs and their members.

E.   **Unfair Competition (Alaska Unfair Trade Practices and Consumer Protection Act AS § 45.50.471, et seq.)**

228.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein, and further allege as follows:

229.   Alaska Unfair Trade Practices and Consumer Protection Act ("UTPA") § 45.50.471(a) prohibits any "unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce."

230.   At times, places, and involving participants known exclusively to McKinsey and other parties and concealed from Plaintiffs, McKinsey has engaged in unlawful, unfair, and fraudulent business practices in violation of the UTPA as set forth above. McKinsey's business practices as described in this complaint are deceptive and violate the UTPA because the practices are likely to deceive consumers in Alaska.

231.   McKinsey knew and should have known at the time of making or disseminating these statements, or causing these statements to be made or disseminated, that such statements were false and misleading and therefore likely to deceive the public.

232.   McKinsey's omissions, which are deceptive and misleading in their own right, render even McKinsey's seemingly truthful statements about opioids false and misleading. All of this conduct, separately and collectively, was likely to deceive Plaintiffs.

233.   McKinsey's business practices as described in this Complaint are unlawful and violate the UTPA.

234.   These unlawful practices include, but are not limited to:

a.   Through Purdue, McKinsey represented that opioids had sponsorship, approval, characteristics, ingredients, uses, or benefits which they did not have in violation of UTPA § 45.50.471(b)(4);

b.      Through Purdue, McKinsey represented that opioids were of a particular standard, quality, or grade when they were of another in violation of UTPA § 45.50.471(b)(6);

c.      McKinsey unlawfully failed to identify and report suspicious prescribing to law enforcement and health authorities; and

d.      Through Purdue and other manufacturers of opioids, McKinsey made or disseminated, directly or indirectly, untrue, false, or misleading statements about the use of opioids to treat chronic pain, or causing untrue, false, or misleading statements about opioids to be made or disseminated to the general public in violation of UTPA.

235.   McKinsey's business practices as described in this Complaint are unfair and violate the UTPA because they offend established public policy, and because the harm they cause to Plaintiffs and Tribal members greatly outweighs any benefits associated with those practices.

236.   As a direct and proximate result of the foregoing acts and practices, McKinsey has received, or will receive, income, profits, and other benefits, which they would not have received if they had not engaged in the violations of the UTPA described in this Complaint.

237.   As a direct and proximate result of the foregoing acts and practices, McKinsey has obtained an unfair advantage over similar businesses that have not engaged in such practices.

**F.      Civil Conspiracy under Alaska Law**

238.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein, and further allege as follows:

239.   Purdue, other manufacturers of opioids, and McKinsey engaged, and continue to engage, in a massive marketing campaign to misstate and conceal the risks of treating long-term chronic, non-acute, and non-cancer pain with opioids as described in this complaint.  Their aggressive marketing campaign enabled them to overcome the longstanding medical consensus

that opioids were unsafe for the treatment of chronic pain and resulted in a significant increase in the number of opioids prescribed nationwide and in Alaska.

240.    For example, McKinsey and Purdue agreed to collaborate for years to market and sell opioids through misleading and unlawful acts. McKinsey and Purdue engaged in unfair trade practices as described in this complaint.

241.    Without Purdue, other manufacturers of opioids, and McKinsey's misrepresentations, which created demand, they would not have been able to sell the increasing quantity of prescription opioids for non-medical or inappropriate purposes.

242.    None of the opioid manufacturers or McKinsey would have succeeded in profiting so much from the opioid epidemic without the concerted conduct of the other parties.

243.    Purdue, other manufacturers of opioids, and McKinsey agreed with each other to accomplish the unlawful purposes of marketing, selling, and distributing prescription opioids through violations of law and misrepresentations Purdue, other manufacturers of opioids, and McKinsey performed numerous overt acts in furtherance of this conspiracy, including marketing, selling, and distributing prescription opioids by means of misrepresentations and omissions, violating Federal and state laws, and turning a blind eye to diversion of prescription opioids.

244.    As a result of the concerted action between the Purdue, other manufacturers of opioids, and McKinsey, Plaintiffs and their members have suffered damages.

245.    Purdue, other manufacturers of opioids, and McKinsey are jointly and severally liable for the results of their concerted efforts.

**G.    Unjust Enrichment under Alaska Law**

246.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein, and further allege as follows:

247.     As an expected and intended result of their conscious wrongdoing as set forth in this Complaint, McKinsey has profited and benefited from the increase in the distribution and purchase of opioids within Plaintiffs' communities, including from opioids foreseeably and deliberately diverted within and into Plaintiffs' communities.

248.     Plaintiffs have expended substantial amounts of money to fix or mitigate the societal harms caused by McKinsey's conduct.

249.     Plaintiffs have conferred a benefit upon McKinsey by paying for what may be called McKinsey's externalities—the costs of the harm caused by McKinsey's negligent or otherwise unlawful distribution and sales practices.

250.     McKinsey is aware of this obvious benefit, and that retention of this benefit is unjust.

251.     Plaintiffs have paid for the cost of McKinsey's externalities and McKinsey has benefitted from those payments because they allowed McKinsey to continue providing customers with a high volume of opioid products.  Because of their deceptive marketing of prescription opioids, McKinsey obtained enrichment they would not otherwise have obtained.  Because of their conscious failure to exercise due diligence in preventing diversion, McKinsey obtained enrichment it would not otherwise have obtained.  The enrichment was without justification and Plaintiffs lack a remedy provided by law.

252.     McKinsey made substantial profits while fueling the prescription drug epidemic in Plaintiffs' communities.

253.     McKinsey has been unjustly enriched by its negligent, intentional, malicious, oppressive, illegal and unethical acts, omissions, and wrongdoing.

254. It would be inequitable to allow McKinsey to retain benefit or financial advantage.

255. McKinsey's misconduct alleged in this case has caused ongoing and persistent harm to Plaintiffs.

256. Plaintiffs demand judgment against McKinsey for restitution, disgorgement, and any other relief allowed in law or equity.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court:

a. Enter judgment against McKinsey and in favor of Plaintiffs;

b. Award compensatory damages in an amount sufficient to compensate Plaintiffs fairly and completely for all damages, treble damages, pre-judgment and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate;

c. Award damages caused by the opioid epidemic, including but not limited to (1) costs for providing medical care, additional therapeutic and prescription drug purchases including costs of obtaining naloxone and suboxone, as well as other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths; (2) costs for providing culturally-informed treatment, counseling, education and rehabilitation services; (3) costs for providing treatment of infants born with opioid-related medical conditions, including NAS; (4) costs for providing care for children whose parents suffer from opioid-related disability or incapacitation; (5) costs associated with social services, criminal justice and rehabilitation relating to the opioid epidemic; and (6) costs for providing transitional housing for those returning to the community;

d. Enter orders and procedures to abate the nuisance created by McKinsey's wrongful conduct;

     e.     Enjoin McKinsey from continuing or repeating the wrongful conduct alleged herein and from the publication and/or dissemination of false and misleading materials directly or indirectly;

     f.     Award Plaintiffs their costs of suit, including reasonable attorneys' fees as provided by law;

     g.     Award such further and additional relief as the Court may deem just and proper under the circumstances; and

     h.     Grant Plaintiffs the right to amend their pleadings to conform to the evidence produced at trial.

## VIII.  <u>JURY DEMAND</u>

Plaintiffs request a trial by jury on all issues so triable.

DATED this 22nd day of February, 2021.

By: _/s/     Lloyd B. Miller_____

Lloyd B. Miller
lloyd@sonosky.net
Donald J. Simon
dsimon@sonosky.net
Whitney A. Leonard
whitney@sonosky.net
**SONOSKY CHAMBERS SACHSE MILLER & MONKMAN, LLP**
725 East Fireweed Lane, Suite 420
Anchorage, AK  99503
Telephone:  907.258.6377
Facsimile:  907.272.8332

Elizabeth J. Cabraser
ecabraser@lchb.com
Eric B. Fastiff
efastiff@lchb.com
**LIEFF, CABRASER, HEIMANN &**
**BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Mark P. Chalos
mchalos@lchb.com
**LIEFF, CABRASER, HEIMANN &**
**BERNSTEIN, LLP**
222 2nd Ave. South, Suite 1640
Nashville, TN  37201
Telephone: (615) 313-9000
Facsimile: (615) 313-9965

Dan Drachler
ddrachler@zsz.com
Henry Avery
havery@zsz.com
**ZWERLING, SCHACHTER & ZWERLING,**
**LLP**
1904 Third Avenue, Suite 1030
Seattle, WA  98101
Telephone: (206) 223-2053
Facsimile: (206) 343-9636

Robert S. Schachter
rschachter@zsz.com
Sona R. Shah
sshah@zsz.com
**ZWERLING, SCHACHTER & ZWERLING,**
**LLP**
41 Madison Avenue
New York, NY 10010
Telephone: (212) 223-3900
Facsimile: (212) 371-5969

*Attorneys for Plaintiffs*